# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| KATHERINE "KATE" ZANONI, ) | |
| ) | |
| **Plaintiff,** ) | NO. _____ |
| ) | |
| **v.** ) | **JURY TRIAL DEMANDED** |
| ) | |
| HOPEWRITERS LLC d/b/a HOPE*BOOKS ) | |
| and BRIAN J. DIXON, ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff Katherine "Kate" Zanoni ("Ms. Zanoni" or "Plaintiff"), by and through her undersigned counsel, files this Complaint and Jury Trial Demand against Defendants Hopewriters LLC d/b/a hope*books ("Hope Books") and Brian J. Dixon (collectively, "Defendants"), and hereby alleges as follows:

## PARTIES

1. Plaintiff Katherine "Kate" Zanoni is a resident of Boise, Idaho, and she is a citizen of the State of Idaho. She is an aspiring author of children's picture books.

2. Defendant Hopewriters LLC d/b/a hope*books is a North Carolina corporation with a principal place of business at 2217 Matthews Township Parkway, Suite D302, Matthews, North Carolina 28105. Its registered agent for service of process is Defendant Brian J. Dixon. Hope Books is a citizen of North Carolina. It is a hybrid book publishing company that offers training, coaching, and community to help aspiring authors write, publish, launch, and sell their books.

3. Defendant Brian J. Dixon is a resident of Charlotte, North Carolina, and he is a citizen of the State of North Carolina. He is the Chief Executive Officer of Hope Books.

**JURISDICTION AND VENUE**

4. The Court has personal jurisdiction over Defendants because North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4, is satisfied, and Defendants have minimum contacts with the State of North Carolina, and the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice to comport with the Due Process Clause.

5. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Ms. Zanoni and Defendants, and the amount in controversy exceeds $75,000.

6. Venue is properly placed in the Western District of North Carolina pursuant to 28 U.S.C. § 1391 because at least one defendant resides in the district and all the defendants are residents of North Carolina, or a substantial part of the events or omissions giving rise to the claims occurred in the district.

**FACTUAL ALLEGATIONS**

7. On October 23, 2024, Ms. Zanoni filled out Hope Books' online picture book publishing interest form. On the form, she provided, among other things, the titles and description for three book ideas.

8. On October 24, 2024, Dixon emailed Ms. Zanoni to invite her to participate in the founding cohort of Hope Books' picture book publishing group.

9. On October 28, 2024, Dixon emailed Ms. Zanoni a recording of a live training he presented to individuals who might be interested in joining the founding, 12-author cohort of Hope Books' picture book publishing group. In the accompanying slide deck, Dixon indicated the following, among other things:

      a.     Authors follow "A Proven Publishing Process . . . guiding you step-by-step

2

from idea development to a hard cover book in just six months."

b.    "You'll work closely with our editorial team, lead illustrator, and publishing specialists to create a book that aligns perfectly with your vision. From refining your story to creating compelling illustrations, you'll have direct access to experienced professionals who will help you make informed decisions at each stage."

c.    "As one of our founding cohort authors, you'll receive exclusive, hands-on attention and personalized feedback. This ensures your book is of the highest quality, captures the essence of your story, and truly stands out."

d.    "Our approach is collaborative—you're not just an author; you're an active partner in the process. You'll be involved in key decisions, from character development to the final illustrations, to ensure that the book truly represents your vision."

e.    "The entire program is designed to fast-track your path to becoming a published author, all while maintaining quality and providing a memorable experience. In just six months, you'll hold your hardcover in your hands—ready to inspire readers."

f.    "We're committed to making high-quality publishing accessible to first-time authors. Here's how it works: You invest $10,000 into the program; We match that investment and split profits 50-50."

10.    On or about October 29, 2024, Dixon emailed Ms. Zanoni asking if she was still interested in joining the picture book cohort and included a link to sign up.

11.    On November 1, 2024, Ms. Zanoni registered for Hope Books' picture book publishing program and paid $7,997 for publishing services (hereinafter referred to as "Publishing Program Agreement"). Individuals, like Ms. Zanoni, who registered for the founding picture book cohort were only charged $7,997.

12. On November 7, 2024, Dixon emailed Ms. Zanoni an updated calendar invitation for the picture book cohort's recurring weekly video meeting that included the Picture Book Publishing Process document as an attachment. That document sets forth a 13-step process toward publishing a picture book. Step 9 of the process is "Publisher Proof—Finalizing Layout and Design: (a) Finalize interior layout, typography, and margins; (b) Verify color accuracy and image resolution; and (c) Order a physical proof and prepare for final adjustments if needed."

13. On November 7, 2024, Dixon emailed Ms. Zanoni a link to access the picture book cohort's Facebook group and a link to the Picture Book Publishing Process curriculum. That document sets forth a 10-step process toward publishing a picture book. The introductory paragraph states, "Rooted in proven storytelling frameworks and supported by professional coaching, developmental editing, and world-class illustration this roadmap ensures your picture book is not only beautifully produced but also deeply meaningful." Step 6 of the process is "Illustration and Layout Process," and it provided, under "Author Review" the following: "Final digital proof provided to author; Minor corrections allowed (not full redesigns); **Focus on reader experience and storytelling quality**." (Emphasis in original).

14. On November 20, 2024, Ms. Zanoni emailed Dixon her main character (relatable hero) illustration description, including HEX color codes and inspirational mockups, for her book *Alana Botswana's Kalahari Safari*.

15. On December 9, 2024, in the picture book cohort Facebook group, Dixon posted, "Our illustrator team sent your relatable hero sketches on Friday. They look awesome. (For those who didn't get theirs yet, make sure you send me your description."

16. On December 16, 2024, Ms. Zanoni emailed Dixon her Pinterest board with inspiration for the look and feel of her book, per his instructions during one of the weekly picture

4

book cohort video meetings.

17. On December 20, 2024, Dixon emailed Ms. Zanoni asking if she still wanted to publish her book within the next twelve months.

18. On December 29, 2024, Ms. Zanoni emailed Dixon her picture book layout in Canva, per his instructions during one of the weekly picture book cohort video meetings.

19. On January 13, 2025, Ms. Zanoni emailed Dixon her picture book layout in Canva with her illustration descriptions added in, per his instructions. She also notified him that she would be late to the next cohort meeting due to a work conflict. On January 28, 2025, Dixon emailed Ms. Zanoni to confirm that he had received her January 13, 2025 email.

20. On February 12, 2025, Hope Books' Director of Publishing, Hope Dover, emailed the members of the picture book cohort, including Ms. Zanoni, with an update notifying everyone that files were moved to editing and illustration. On February 26, 2025, Ms. Zanoni emailed Dover to thank her and to state she was looking forward to the feedback.

21. On or about March 10, 2025, during the weekly picture book cohort video call, Dixon reported he spoke with Hope Books' intellectual property lawyer. Dixon said Hope Books had planned to use artificial intelligence to create illustrations, which was not previously disclosed to the authors, and Hope Books' lawyer said Hope Books had to use human-made illustrations so that they could be copyrighted. Dixon said that Hope Books was taking the lawyer's advice and that Hope Books would absorb the cost of hiring human illustrators for each author's book. Dixon also said the authors would own the copyright and Hope Books will have no claim to it.

22. On March 18, 2025, Dover emailed Ms. Zanoni a manuscript template to streamline the editing process for her picture book. Ms. Zanoni was asked to "[c]opy and paste the full text of your story into the first tab of the document," "[f]ill out the required details about your main

5

character(s) in the second tab," and "Guiding Questions (Third Tab): This tab includes optional guiding questions to help you develop your character."

23. On March 21, 2025, Ms. Zanoni emailed Dover a manuscript template with the book's text, detailed character illustration brief with descriptions of each scene and HEX code color schemes and attached inspiration pictures for the main character.

24. On or about March 31, 2025, during another weekly picture book cohort video call, Dixon re-explained the illustration process to hire human illustrators and stated that Hope Books could not and would not use artificial intelligence to create illustrations because it could not be copyrighted.

25. On April 30, 2025, Hope Books' Children's Book Developmental Editor, Gloria Day, emailed Ms. Zanoni a link to a document with suggested edits to the manuscript.

26. On May 4, 2025, Ms. Zanoni emailed Day that she had implemented most of the suggested edits and that her changes are also reflected in the illustration tab for consistency. On May 5, 2025, Day responded via email to Ms. Zanoni, stating "Wonderful! Yes, it's exciting to see you move one step closer to having your book published!"

27. On May 7, 2025, Hope Books' Chief Operating Officer, Erin Brenneman, emailed Ms. Zanoni to inquire whether she wanted to move forward with publishing through Hope Books or publish on her own. She stated that Hope Books was "getting ready to send out the publishing contracts." On May 8, 2025, Ms. Zanoni emailed Brenneman to state that she would move forward to publish with Hope Books.

28. On May 22, 2025, Dover emailed Ms. Zanoni to confirm that Ms. Zanoni had "made all necessary updates to your manuscript based on [the children's book developmental editor's] feedback." Dover further stated, "We are working on copy edits now and will have main

6

character options soon."

29. On May 23, 2025, Dover emailed Ms. Zanoni requesting that she "review the manuscript and sign the acknowledgment" to confirm that Hope Books is "moving forward with the correct, final version." Dover also stated that "the main character illustration process has officially begun" and that Hope Books is "excited to bring your story to life and will be in touch soon with the first round of character concepts for your feedback." On May 26, 2025, Ms. Zanoni signed and dated the acknowledgement and emailed Dover that she was "excited to see the main character illustrations soon."

30. On or about May 30, 2025, without any disclosure to Ms. Zanoni, Dixon used a business called 99Designs to conduct a design contest whereby individuals submitted illustration proposals of Ms. Zanoni's main character for Dixon's consideration.

31. On May 30, 2025, Dover emailed Ms. Zanoni that Hope Books added five main character illustration options to the document to which Ms. Zanoni had access. Dover requested that Ms. Zanoni leave any feedback by 5:00 pm the following day. On May 31, 2025, Ms. Zanoni identified her top choice for the main character illustration and ranked the remaining illustrations inside the manuscript workflow as instructed by Dover.

32. On June 7, 2025, Dover created an Instagram poll for the public to help choose the main character illustration and tagged Ms. Zanoni. Ms. Zanoni accepted the Instagram invitation to collaborate and shared the post in her Instagram stories.

33. On June 9, 2025, Dixon announced at the end of the picture book cohort's recurring weekly video meeting that it was their last call and abruptly ended the call. Neither Ms. Zanoni nor the other authors in the cohort were previously notified of any change in timeline or that this was the last cohort call. Dixon subsequently posted in the Facebook group to notify authors of next

steps following the final cohort call.

34. On July 25, 2025, Dover emailed Ms. Zanoni a PDF proof of her book from the with illustrations containing visible artificial intelligence-generated artifacts that were inconsistent with Hope Books' prior claim to only provide human-created main character illustrations. Analysis of technical artifacts included anatomical errors, *e.g.,* cheetah misrepresented as a leopard, bearded lion, multiple renderings of the same character, *e.g.,* three separate versions of the father, misspelling of the word "school" with a distorted symbol in place of normal text, inconsistent character renderings, *e.g.,* main character had blue eyes in some illustrations and black eyes in others, and color bleeding outside of the line flow of the illustration, *e.g.,* main character's eye color exceeded bordering of eye shape.

35. On July 26, 2025, Ms. Zanoni emailed Dover with numerous edits to her manuscript proof, including missing text from the story and glossary, as well as edits to obvious errors in the illustrations that were visibly generated by artificial intelligence.

36. On July 29, 2025, Hope Books emailed Ms. Zanoni asking her to confirm her phone number and stating it wanted to offer her a publishing contract.

37. On August 4, 2025, Ms. Zanoni emailed Dover twice with additional edits to illustrations, including mistakes regarding character consistency. On August 5, 2025, Dover confirmed that she received the August 4, 2025 email and stated she will "pass these last two comments along." Following Ms. Zanoni's email confirming that Dover also saw the July 26, 2025 email with edits, Dover responded on August 7, 2025 that she had seen that email and "passed on all 3 emails."

38. On August 15, 2025, Dixon emailed Ms. Zanoni to ask permission for him to "start[] teasing out on our social media, zoom meetings, email list, etc." her impending picture

8

book. Ms. Zanoni responded to Dixon on the same day and granted permission. Dixon responded, "Awesome."

39. On September 4, 2026, Hope Books listed Ms. Zanoni's bibliographic information on Google books, including ISBN number, without first notifying Ms. Zanoni.

40. On September 9, 2025, Dixon announced on the Hope Books picture book cohort Facebook page the order of the first four picture books that will be published, stating "Amy's is scheduled for October 9th Colette's is shortly after that. Then Kate's."

41. On September 9, 2025, Dover emailed the picture book cohort to notify the group of the status of publishing books, a new recurring monthly cohort meeting, and a consolidated Hope Books author Facebook group.

42. On September 15, 2025, Dixon posted from his Facebook profile a preview of four picture book covers, including Ms. Zanoni's cover. He also changed his Facebook cover photo to include a preview of five picture book covers, including Ms. Zanoni's cover.

43. On September 23, 2025, Dixon emailed Ms. Zanoni updates regarding the first two picture books to be published from the cohort: Amy Collette's *Lola's Night Under the Stars* and Colette Waters' *Beautiful Things Take Time*. His email also stated that Hope Books has a publication rights contract for her, and his email included a registration link to the cohort's monthly video meeting. His email also included a link to fill out an Author Information Form. Finally, his email stated that Hope Books decided to offer both hardcover and softcover versions of her book. That same day, Ms. Zanoni responded to Dixon to notify him that she filled out the form and will keep an eye out for the publication rights contract.

44. On September 23, 2025, Ms. Zanoni received an electronic invitation to sign a Hope Books Publishing Agreement (Picture Books) (hereinafter referred to as "Publication Rights

9

Agreement"), and she signed the Publication Rights Agreement that day under the impression that Hope Books would fix all the manuscript and illustration errors she identified in the proof of her book prior to publication. The Publication Rights Agreement set forth the parties' respective rights in connection with Ms. Zanoni's forthcoming book, including Ms. Zanoni's right to royalties. It also included the following promises by Hope Books:

a. Access to Hope Books' training program, including the online library, live calls, and private Facebook group;

b. Templates and training for writing the Author's book manuscript;

c. Editing and formatting of the completed manuscript;

d. Illustration of an original character, following Hope Books' three-step process; and

e. Publication of Ms. Zanoni's book once a completed manuscript is received from her.

45. On October 9, 2025, the first picture book from the cohort, *Lola's Night Under the Stars* by Amy Collette, was published.

46. On October 16, 2025, the second book from the cohort, *Beautiful Things Take Time* by Colette Waters, was published.

47. On or about October 28, 2025, Ms. Zanoni's illustration brief was posted to a public, third-party website, Scribd, without her authorization or knowledge.

48. On November 7, 2025, Ms. Zanoni posted in the Hope Books cohort Facebook group. She posted that she sent many edits to the manuscript and to artificial intelligence-generated illustrations but had not heard back regarding the edits, even though she was under the impression that her book was supposed to be published before Halloween. Ms. Zanoni also asked why

10

illustrators were not given attribution. In addition, she asked about the status of her book because there was a hard copy sitting on Dixon's bookshelf in the background of a Hope Books video recording, and she asked whether Hope Books was running ads for the books that were already published because she had not seen any ads. Dixon responded with a post, stating that Hope Books used contract illustrators and agreed not to give them attribution so that the authors would have the full copyright. Dixon also stated there were mistakes that needed to be fixed in Ms. Zanoni's book. With respect to ads, Dixon stated that Hope Books has an ad manager who is strategic about the way in which Hope Books runs picture book ads. Dixon later deleted his post and the related thread from the Facebook group.

49. On December 17, 2025, Ms. Zanoni posted in the Hope Books cohort Facebook group asking if the mistakes in her book were corrected, when a final PDF would be available for review and approval, and if there was an estimated time of publication. Dixon responded, stating Hope Books sent the PDF off for another publisher's hard copy. Ms. Zanoni responded, thanking Dixon. Dixon then deleted Ms. Zanoni's post and the entire thread from the Facebook group.

50. On January 15, 2026, Ms. Zanoni had a meeting via Zoom with Dixon and Hope Books' office manager, Rebekah Barbee. Dixon said the final proof was approved by the publisher and ready for a March 17, 2026 publishing date. Ms. Zanoni never saw the final proof and raised quality concerns, requesting the final proof for review to ensure illustration inconsistencies were properly corrected. Dixon stated they were "design choices." Ms. Zanoni stated that three different renderings of the father character is a glaring mistake, not a design choice, and asked to review the final PDF prior to publication.

51. On January 21, 2026, Ms. Zanoni received the updated PDF. Barbee stated that no further revisions would be made, and this version would be sent to print. Instead of fixing the

11

underlying issues, the updated PDF contained mere coverups that do not meet children's book publishing standards. Analysis of technical artifacts included the following: low-resolution pixelated edge blending instead of smooth vector or brush strokes, patch overlay on top of strange character where standard text should appear, inconsistent shading and coloring with varying textures mismatching the line art, manual shapes placed over image disrupting the line flow of the illustration, distorted lettering in which text was not rendered correctly, illogical background details, *e.g.*, leaves surrounding the lion, and anatomical errors, *e.g.*, a bearded lion.

52. On January 24, 2026, Ms. Zanoni emailed Dixon and Barbee to raise quality concerns regarding unprofessional edits, AI-generated illustration mistakes, misuse of intellectual property on public third-party websites, and lack of transparency regarding the publisher's illustration creation process, internal quality control process, and proof approval process. Ms. Zanoni asked for full transparency, which was never delivered by Dixon.

53. On January 24, 2026, Dixon emailed Ms. Zanoni and stated the PDF would not be printed, distributed, or used in any capacity, confirmed that production on Ms. Zanoni's book is paused, and stated that the publisher would launch an internal review regarding Ms. Zanoni's concerns. Dixon said they would follow up with a comprehensive written response addressing each concern, including next steps for revision and quality assurance by February 6, 2026.

54. On January 24, 2026, Ms. Zanoni emailed Dixon information from Scribl and Scribd, third-party websites, regarding intellectual property distribution. Ms. Zanoni asked for transparency and clarity regarding authorization of her intellectual property to be distributed on third-party systems without her authority or prior knowledge.

55. On January 25, 2026, Dixon emailed Ms. Zanoni a request for links to the third-party postings. In response, Ms. Zanoni provided links to her intellectual property (illustration

brief) on the Scribd website and the public illustration contest Dixon hosted on the 99Designs website to solicit a contract illustrator. Ms. Zanoni notified Dixon that her proprietary work, including her character description and related materials originating from her manuscript, were publicly accessible on these platforms, which could put the integrity of her manuscript and creative content at risk.

56.    On February 5, 2026, Brenneman, emailed Ms. Zanoni and stated Hope Books' internal review determined the book meets the publisher's quality standards and is ready for publication as is. Brenneman falsely stated that no manuscript of the book file belonging to Ms. Zanoni was distributed on Scribd or any third-party platform and falsely stated that computer-assisted tools are within the scope of the parties' agreement. Brenneman stated the book will proceed through final production and publication to the publisher's standards and that Hope Books will not be reopening any discussion regarding tools, platforms, or production workflows.

57.    On February 5, 2026, Ms. Zanoni emailed Brenneman and Dixon formal notice revoking any and all authorization for Hope Books to publish, distribute, display, market, or otherwise use her manuscript, character descriptions, illustrations, metadata, proofs, or any derivative materials in any format or on any platform. Ms. Zanoni also demanded all files, proofs, drafts, illustrations, metadata, ISBN registrations, marketing assets, and internal records associated with her book be revoked, removed, and deleted from all Hope Books systems and from any third parties to whom such materials were provided and a complete written disclosure identifying: (a) any platforms, distributors, or aggregators to whom my materials were submitted; (b) the dates of submission and removal; (c) any ISBNs registered or assigned; and (d) any instances of public availability, whether temporary or ongoing. Ms. Zanoni also demanded written confirmation that Hope Books asserts no current or future publishing, distribution, or exploitation rights in Ms.

Zanoni's manuscript or any derivative works, and that all such rights have fully reverted to Ms. Zanoni. Finally, Ms. Zanoni notified Hope Books that, effective immediately, Hope Books must cease and desist from any further use, distribution, display, or representation of authority over Ms. Zanoni's work.

58. On February 9, 2026, Brenneman emailed Ms. Zanoni and offered to send a mutual termination agreement to resolve the ongoing dispute. She stated Hope Books would move forward with publishing if Ms. Zanoni did not sign the agreement. On February 10, 2026, Ms. Zanoni confirmed receipt and notified Brenneman she was consulting legal counsel. On February 11, 2026, Brenneman confirmed receipt of Ms. Zanoni's message and that production of her book was paused.

59. On February 13, 2026, Brenneman emailed Ms. Zanoni a proposed Dissolution Agreement and stated Hope Books does not own or control third-party platforms or user-generated content hosted thereon and therefore cannot commit to the removal or takedown of materials posted or maintained by third parties. Ms. Zanoni confirmed receipt of the proposed Dissolution Agreement and stated she would be reviewing with counsel to ensure completeness and that it accurately reflects full scope of revision of rights and termination of both the Publishing Program Agreement and the Publication Rights Agreement.

60. Between February 17, 2026 and February 24, 2026, Ms. Zanoni and Hope Books emailed each other with drafts of the proposed Dissolution Agreement.

61. On February 27, 2026, Brenneman emailed Ms. Zanoni that Hope Books is not agreeable to Ms. Zanoni's revisions to the proposed Dissolution Agreement, but Hope Books no longer intends to publish Ms. Zanoni's book due to misalignment. Brenneman also said Hope Books is willing to terminate the working relationship. Ms. Zanoni responded with her redlines in

14

an effort to conclude the ongoing dispute amicably. Ms. Zanoni explained that, without a written agreement from Hope Books, she would escalate through legal counsel.

62. On March 9, 2026, Ms. Zanoni noticed she was removed and blocked from the Hope Books' author Facebook group. Hope Books kept all amounts paid ($7,997) for the program while denying Ms. Zanoni access to cohort materials. Ms. Zanoni also noticed her illustration brief was removed from the Scribd website, even though Hope Books previously denied having control over Ms. Zanoni's materials on third-party websites. Scribd confirmed the material was removed by request of the licensing authority, *i.e.,* Hope Books.

63. Ms. Zanoni has suffered and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law, including but not limited to loss of control over her work, interference with her exclusive rights to publish and exploit the work, and harm to its reputation and marketability. Absent injunctive relief, such harm will continue and cannot be fully remedied by monetary damages.

<u>**COUNT I - FRAUD**</u>

**(AGAINST ALL DEFENDANTS)**

64. Ms. Zanoni incorporates by reference all preceding paragraphs as if fully set forth herein.

65. Defendants made false representations and omissions of material fact to Ms. Zanoni regarding the nature and quality of the services to be provided.

66. On October 28, 2024, Dixon represented that:

a. Authors follow "A Proven Publishing Process . . . guiding you step-by-step from idea development to a hard cover book in just six months."

b. "You'll work closely with our editorial team, lead illustrator, and publishing

15

specialists to create a book that aligns perfectly with your vision. From refining your story to creating compelling illustrations, you'll have direct access to experienced professionals who will help you make informed decisions at each stage."

c.    "As one of our founding cohort authors, you'll receive exclusive, hands-on attention and personalized feedback. This ensures your book is of the highest quality, captures the essence of your story, and truly stands out."

d.    "Our approach is collaborative—you're not just an author; you're an active partner in the process. You'll be involved in key decisions, from character development to the final illustrations, to ensure that the book truly represents your vision."

e.    "The entire program is designed to fast-track your path to becoming a published author, all while maintaining quality and providing a memorable experience. In just six months, you'll hold your hardcover in your hands—ready to inspire readers."

67.    On or about March 10, 2025, Dixon represented that Hope Books would only use human illustrators for Ms. Zanoni's book and would not use artificial intelligence for illustrations.

68.    On or about March 31, 2025, Dixon again represented that Hope Books would only use human illustrators for Ms. Zanoni's book and would not use artificial intelligence for illustrations.

69.    These representations were false or misleading representations or concealments of material past or existing facts, in that, among things:

a.    Ms. Zanoni was never allowed direct access to any illustrators and was otherwise not allowed to be an active partner in the illustration process;

b.    After 15 months, Ms. Zanoni still did not receive a completed book meeting industry standards;

c. The illustrations provided by Defendants to Ms. Zanoni were generated or materially assisted by artificial intelligence tools; and

d. The illustrations provided by Defendants contained characteristics inconsistent with human-created work and were subsequently modified or edited in a manner that concealed or attempted to conceal such deficiencies.

70. The representations or omissions were reasonably calculated to deceive in that Defendants knew that the representations were false or misleading at the time they were made, or made such representations with reckless disregard for their truth. Defendants had no intent to perform as promised.

71. Defendants made the representations or omissions with the intent to deceive and with the intent that they be acted upon in that the representations were made to induce Ms. Zanoni to enter into and continue performance under the Publishing Program Agreement and Publication Rights Agreement.

72. Ms. Zanoni was, in fact, deceived by the representations or omissions and acted upon them in that she reasonably relied on Defendants' representations and omissions in deciding to enter into the Publishing Program Agreement and Publication Rights Agreement.

73. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Ms. Zanoni suffered damages, including but not limited to the loss of funds paid, additional costs incurred to replace services, delay in publication, and related harm.

74. Ms. Zanoni has suffered and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law, including but not limited to loss of control over her work, interference with her exclusive rights to publish and exploit the work, and harm to its reputation and marketability. Absent injunctive relief, such harm will continue and cannot be fully

17

remedied by monetary damages.

**COUNT II - NEGLIGENT MISREPRESENATION**

**(AGAINST ALL DEFENDANTS)**

75.     Ms. Zanoni incorporates by reference all preceding paragraphs as if fully set forth herein.

76.     In the course of Defendants' book publishing business, Defendants supplied false information to Ms. Zanoni with the intent for Ms. Zanoni to rely on that information for guidance or benefit in deciding to enter into the Publishing Program Agreement and Publication Rights Agreement.

77.     Defendants made false representations to Ms. Zanoni upon which Ms. Zanoni relied to her detriment, and the false representations were prepared by Defendants, who owed Ms. Zanoni a duty of care.

78.     On October 28, 2024, Dixon represented that:

a.     Authors follow "A Proven Publishing Process . . . guiding you step-by-step from idea development to a hard cover book in just six months."

b.     "You'll work closely with our editorial team, lead illustrator, and publishing specialists to create a book that aligns perfectly with your vision. From refining your story to creating compelling illustrations, you'll have direct access to experienced professionals who will help you make informed decisions at each stage."

c.     "As one of our founding cohort authors, you'll receive exclusive, hands-on attention and personalized feedback. This ensures your book is of the highest quality, captures the essence of your story, and truly stands out."

d.     "Our approach is collaborative—you're not just an author; you're an active

18

partner in the process. You'll be involved in key decisions, from character development to the final illustrations, to ensure that the book truly represents your vision."

e. "The entire program is designed to fast-track your path to becoming a published author, all while maintaining quality and providing a memorable experience. In just six months, you'll hold your hardcover in your hands—ready to inspire readers."

79. On or about March 10, 2025, Dixon represented that Hope Books would only use human illustrators for Ms. Zanoni's book and would not use artificial intelligence for illustrations.

80. On or about March 31, 2025, Dixon again represented that Hope Books would only use human illustrators for Ms. Zanoni's book and would not use artificial intelligence for illustrations.

81. These representations were false or misleading, in that, among things:

a. Ms. Zanoni was never allowed direct access to any illustrators and was otherwise not allowed to be an active partner in the illustration process;

b. After 15 months, Ms. Zanoni still did not receive a completed book meeting industry standards;

c. The illustrations provided by Defendants to Ms. Zanoni were generated or materially assisted by artificial intelligence tools; and

d. The illustrations provided by Defendants contained characteristics inconsistent with human-created work and were subsequently modified or edited in a manner that concealed or attempted to conceal such deficiencies.

82. As a book publisher for a cohort of authors of picture books. Defendants owed those authors, including Ms. Zanoni, a duty of care with respect to its publishing acts and services.

83. Defendants owed Ms. Zanoni a duty of care in tort that arose out of the parties'

19

contractual relationship in connection with the Publishing Program Agreement and Publication Rights Agreement because Hope Books, as a party to those contracts, was obligated to perform the contracts with ordinary care toward Ms. Zanoni.

84. In the alternative, Defendants owed Ms. Zanoni a duty of care to conform their conduct toward Ms. Zanoni with a specific standard of reasonableness.

85. Defendants failed to exercise reasonable care or competence in communicating the false information to Ms. Zanoni.

86. Ms. Zanoni reasonably and justifiably relied on Defendants' representations and omissions in deciding to enter into the Publishing Program Agreement and Publication Rights Agreement.

87. As a direct and proximate result of Defendants' negligent misrepresentations, Ms. Zanoni suffered damages, including but not limited to the loss of funds paid, additional costs incurred to replace services, delay in publication, and related harm.

88. Ms. Zanoni has suffered and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law, including but not limited to loss of control over her work, interference with her exclusive rights to publish and exploit the work, and harm to its reputation and marketability. Absent injunctive relief, such harm will continue and cannot be fully remedied by monetary damages.

## COUNT III - VIOLATION OF NORTH CAROLINA
## UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. § 75–1.1

### (AGAINST ALL DEFENDANTS)

89. Ms. Zanoni incorporates by reference all preceding paragraphs as if fully set forth herein.

90. Defendants engaged in unfair or deceptive acts or practices in or affecting

20

commerce and proximately caused injury to Ms. Zanoni in connection with Defendants' false representations.

91. On October 28, 2024, Dixon represented that:

a. Authors follow "A Proven Publishing Process . . . guiding you step-by-step from idea development to a hard cover book in just six months."

b. "You'll work closely with our editorial team, lead illustrator, and publishing specialists to create a book that aligns perfectly with your vision. From refining your story to creating compelling illustrations, you'll have direct access to experienced professionals who will help you make informed decisions at each stage."

c. "As one of our founding cohort authors, you'll receive exclusive, hands-on attention and personalized feedback. This ensures your book is of the highest quality, captures the essence of your story, and truly stands out."

d. "Our approach is collaborative—you're not just an author; you're an active partner in the process. You'll be involved in key decisions, from character development to the final illustrations, to ensure that the book truly represents your vision."

e. "The entire program is designed to fast-track your path to becoming a published author, all while maintaining quality and providing a memorable experience. In just six months, you'll hold your hardcover in your hands—ready to inspire readers."

92. On or about March 10, 2025, Dixon represented that Hope Books would only use human illustrators for Ms. Zanoni's book and would not use artificial intelligence for illustrations.

93. On or about March 31, 2025, Dixon again represented that Hope Books would only use human illustrators for Ms. Zanoni's book and would not use artificial intelligence for illustrations.

94.     The representations deceived or had a tendency to deceive Ms. Zanoni to enter into and continue performance under the Publishing Program Agreement and Publication Rights Agreement.

95.     Defendants made false representations and omissions of material fact to Ms. Zanoni regarding the nature and quality of the services to be provided upon which Ms. Zanoni relied. Such fraudulent statements constitute substantial aggravating circumstances.

96.     Defendants representations constituted an unfair practice because they offended established public policy and were otherwise immoral, unethical, oppressive, unscrupulous, or substantially injurious to Ms. Zanoni.

97.     Aside from deceiving Ms. Zanoni to enter into and continue performance under the Publishing Program Agreement and Publication Rights Agreement, Defendants engaged in an offensive, immoral, unethical, oppressive, and unscrupulous practice of repeatedly making unprofessional edits, AI-generated illustration mistakes, misuse of intellectual property on public third-party websites, and lack of transparency regarding the publisher's illustration creation process, internal quality control process, and proof approval process.

98.     Defendants' acts or practices of working with Ms. Zanoni in connection with book publishing affected commerce because it constituted business activity and the exchange of commercial services.

99.     As a direct and proximate result of Defendants' unfair and deceptive conduct, Ms. Zanoni suffered damages, including but not limited to the loss of funds paid, additional costs incurred to replace services, delay in publication, and related harm.

100.    Ms. Zanoni is entitled to treble its damages under N.C. Gen. Stat. § 75–1.16.

101.    Ms. Zanoni is entitled to reasonable attorney's fees under N.C. Gen. Stat. § 75–

22

1.16.1 because Defendants have willfully engaged in the acts or practices described herein, and there was an unwarranted refusal by Defendants to fully resolve the matter which constitutes the basis of this action.

102. Ms. Zanoni has suffered and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law, including but not limited to loss of control over her work, interference with her exclusive rights to publish and exploit the work, and harm to its reputation and marketability. Absent injunctive relief, such harm will continue and cannot be fully remedied by monetary damages.

## COUNT IV – BREACH OF CONTRACT (PUBLISHING PROGRAM AGREEMENT)

### (AGAINST HOPE BOOKS)

103. Ms. Zanoni incorporates by reference all preceding paragraphs as if fully set forth herein.

104. The Publishing Program Agreement is a valid contract between Ms. Zanoni and Hope Books; Ms. Zanoni performed the contract; Hope Books materially breached the terms of the contract; and the breach caused financial loss to Ms. Zanoni.

105. On November 1, 2024, Ms. Zanoni paid Hope Books $7,997 in exchange for Hope Books' promise to include Ms. Zanoni within its 12-author cohort of a picture book publishing program and Hope Books' promise to operate the program in the following manner:

a. Authors follow "A Proven Publishing Process . . . guiding you step-by-step from idea development to a hard cover book in just six months."

b. "You'll work closely with our editorial team, lead illustrator, and publishing specialists to create a book that aligns perfectly with your vision. From refining your story to creating compelling illustrations, you'll have direct access to experienced professionals who will

23

help you make informed decisions at each stage."

c. "As one of our founding cohort authors, you'll receive exclusive, hands-on attention and personalized feedback. This ensures your book is of the highest quality, captures the essence of your story, and truly stands out."

d. "Our approach is collaborative—you're not just an author; you're an active partner in the process. You'll be involved in key decisions, from character development to the final illustrations, to ensure that the book truly represents your vision."

e. "The entire program is designed to fast-track your path to becoming a published author, all while maintaining quality and providing a memorable experience. In just six months, you'll hold your hardcover in your hands—ready to inspire readers."

f. "We're committed to making high-quality publishing accessible to first-time authors. Here's how it works: You invest $10,000 into the program; We match that investment and split profits 50-50."

106. Ms. Zanoni performed the contract by making the required payment to Hope Books and by working with Hope Books to provide her manuscript and other materials to facilitate Hope Books' publication of her book.

107. Hope Books materially breached the Publishing Program Agreement in the following ways, among others:

a. Ms. Zanoni was never allowed direct access to any illustrators and was otherwise not allowed to be an active partner in the illustration process; and

b. After 15 months, Ms. Zanoni still did not receive a completed book meeting industry standards.

108. Hope Books' breach of contract caused Ms. Zanoni to incur damages, including but

24

not limited to the loss of funds paid, additional costs incurred to replace services, delay in publication, and related harm.

109. Ms. Zanoni has suffered and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law, including but not limited to loss of control over her work, interference with her exclusive rights to publish and exploit the work, and harm to its reputation and marketability. Absent injunctive relief, such harm will continue and cannot be fully remedied by monetary damages.

## COUNT V – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (PUBLISHING PROGRAM AGREEMENT)

### (AGAINST HOPE BOOKS)

110. Ms. Zanoni incorporates by reference all preceding paragraphs as if fully set forth herein.

111. The Publishing Program Agreement is a valid contract between Ms. Zanoni and Hope Books; Ms. Zanoni performed the contract; Hope Books materially breached the terms of the contract; and the breach caused financial loss to Ms. Zanoni.

112. On November 1, 2024, Ms. Zanoni paid Hope Books $7,997 in exchange for Hope Books' promise to include Ms. Zanoni within its 12-author cohort of a picture book publishing program and Hope Books' promise to operate the program in the following manner:

a. Authors follow "A Proven Publishing Process . . . guiding you step-by-step from idea development to a hard cover book in just six months."

b. "You'll work closely with our editorial team, lead illustrator, and publishing specialists to create a book that aligns perfectly with your vision. From refining your story to creating compelling illustrations, you'll have direct access to experienced professionals who will help you make informed decisions at each stage."

c.    "As one of our founding cohort authors, you'll receive exclusive, hands-on attention and personalized feedback. This ensures your book is of the highest quality, captures the essence of your story, and truly stands out."

d.    "Our approach is collaborative—you're not just an author; you're an active partner in the process. You'll be involved in key decisions, from character development to the final illustrations, to ensure that the book truly represents your vision."

e.    "The entire program is designed to fast-track your path to becoming a published author, all while maintaining quality and providing a memorable experience. In just six months, you'll hold your hardcover in your hands—ready to inspire readers."

f.    "We're committed to making high-quality publishing accessible to first-time authors. Here's how it works: You invest $10,000 into the program; We match that investment and split profits 50-50."

113.    Ms. Zanoni performed the contract by making the required payment to Hope Books and by working with Hope Books to provide her manuscript and other materials to facilitate Hope Books' publication of her book.

114.    Hope Books materially breached an implied promise to act reasonably and not arbitrarily or irrationally in exercising discretion relating to its performance of the Publishing Program Agreement, and Hope Books exercised discretion in bad faith and in a manner that deprived Ms. Zanoni of the benefit of the agreement, in the following ways, among others:

a.    Ms. Zanoni was never allowed direct access to any illustrators and was otherwise not allowed to be an active partner in the illustration process; and

b.    After 15 months, Ms. Zanoni still did not receive a completed book meeting industry standards.

26

115. Hope Books' breach of an implied promise to act reasonably and not arbitrarily or irrationally in exercising discretion relating to its performance of the Publishing Program Agreement caused Ms. Zanoni to incur damages, including but not limited to the loss of funds paid, additional costs incurred to replace services, delay in publication, and related harm.

116. Ms. Zanoni has suffered and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law, including but not limited to loss of control over her work, interference with her exclusive rights to publish and exploit the work, and harm to its reputation and marketability. Absent injunctive relief, such harm will continue and cannot be fully remedied by monetary damages.

## COUNT VI – BREACH OF CONTRACT (PUBLICATION RIGHTS AGREEMENT)
### (AGAINST HOPE BOOKS)

117. Ms. Zanoni incorporates by reference all preceding paragraphs as if fully set forth herein.

118. The Publication Rights Agreement is a valid contract between Ms. Zanoni and Hope Books; Ms. Zanoni performed the contract; Hope Books materially breached the terms of the contract; and the breach caused financial loss to Ms. Zanoni.

119. On September 23, 2025, Ms. Zanoni and Hope Books entered into the Publication Rights Agreement, which set forth the parties' respective rights in connection with Ms. Zanoni's forthcoming book, including Ms. Zanoni's right to royalties. The Publication Rights Agreement also contained the following promises from Hope Books:

a. Access to Hope Books' training program, including the online library, live calls, and private Facebook group;

b. Templates and training for writing the Author's book manuscript;

27

c. Editing and formatting of the completed manuscript;

d. Illustration of an original character, following Hope Books' three-step process; and

e. Publication of Ms. Zanoni's book once a completed manuscript is received from her.

120. Ms. Zanoni performed the contract by working with Hope Books to provide her manuscript and other materials to facilitate Hope Books' publication of her book.

121. Hope Books materially breached the Publication Rights Agreement in the following ways, among others:

a. Ms. Zanoni was never allowed direct access to any illustrators and was otherwise not allowed to be an active partner in the illustration process;

b. After 15 months, Ms. Zanoni still did not receive a completed book meeting industry standards;

c. The illustrations provided by Defendants to Ms. Zanoni were generated or materially assisted by artificial intelligence tools;

d. The illustrations provided by Defendants contained characteristics inconsistent with human-created work and were subsequently modified or edited in a manner that concealed or attempted to conceal such deficiencies; and

e. Ms. Zanoni was removed and blocked from the Hope Books' author Facebook group.

122. Hope Books' breach of contract caused Ms. Zanoni to incur damages, including but not limited to costs incurred to replace services, delay in publication, and related harm.

123. Ms. Zanoni has suffered and will continue to suffer immediate and irreparable harm

28

for which there is no adequate remedy at law, including but not limited to loss of control over her work, interference with her exclusive rights to publish and exploit the work, and harm to its reputation and marketability. Absent injunctive relief, such harm will continue and cannot be fully remedied by monetary damages.

## COUNT VII – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (PUBLICATION RIGHTS AGREEMENT)

### (AGAINST HOPE BOOKS)

124. Ms. Zanoni incorporates by reference all preceding paragraphs as if fully set forth herein.

125. The Publication Rights Agreement is a valid contract between Ms. Zanoni and Hope Books; Ms. Zanoni performed the contract; Hope Books materially breached the terms of the contract; and the breach caused financial loss to Ms. Zanoni.

126. On September 23, 2025, Ms. Zanoni and Hope Books entered into the Publication Rights Agreement, which set forth the parties' respective rights in connection with Ms. Zanoni's forthcoming book, including Ms. Zanoni's right to royalties. The Publication Rights Agreement also contained the following promises from Hope Books:

a. Access to Hope Books' training program, including the online library, live calls, and private Facebook group;

b. Templates and training for writing the Author's book manuscript;

c. Editing and formatting of the completed manuscript;

d. Illustration of an original character, following Hope Books' three-step process; and

e. Publication of Ms. Zanoni's book once a completed manuscript is received from her.

29

127. Ms. Zanoni performed the contract by working with Hope Books to provide her manuscript and other materials to facilitate Hope Books' publication of her book.

128. Hope Books materially breached an implied promise to act reasonably and not arbitrarily or irrationally in exercising discretion relating to its performance of the Publication Rights Agreement, and Hope Books exercised discretion in bad faith and in a manner that deprived Ms. Zanoni of the benefit of the agreement, in the following ways, among others:

a. Ms. Zanoni was never allowed direct access to any illustrators and was otherwise not allowed to be an active partner in the illustration process;

b. After 15 months, Ms. Zanoni still did not receive a completed book meeting industry standards;

c. The illustrations provided by Defendants to Ms. Zanoni were generated or materially assisted by artificial intelligence tools;

d. The illustrations provided by Defendants contained characteristics inconsistent with human-created work and were subsequently modified or edited in a manner that concealed or attempted to conceal such deficiencies; and

e. Ms. Zanoni was removed and blocked from the Hope Books' author Facebook group.

129. Hope Books' breach of an implied promise to act reasonably and not arbitrarily or irrationally in exercising discretion relating to its performance of the Publication Rights Agreement caused Ms. Zanoni to incur damages, including but not limited to costs incurred to replace services, delay in publication, and related harm.

130. Ms. Zanoni has suffered and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law, including but not limited to loss of control over her

30

work, interference with her exclusive rights to publish and exploit the work, and harm to its reputation and marketability. Absent injunctive relief, such harm will continue and cannot be fully remedied by monetary damages.

## COUNT VIII – UNJUST ENRICHMENT

### (AGAINST HOPE BOOKS)

131. Ms. Zanoni incorporates by reference all preceding paragraphs as if fully set forth herein.

132. Hope Books obtained and retained benefits conferred by Ms. Zanoni by keeping $7,997 paid by Ms. Zanoni for publishing services.

133. On November 1, 2024, Ms. Zanoni paid Hope Books $7,997 in exchange for Hope Books' promise to include Ms. Zanoni within its 12-author cohort of a picture book publishing program and Hope Books' promise to  operate the program in the following manner:

a. Authors follow "A Proven Publishing Process . . . guiding you step-by-step from idea development to a hard cover book in just six months."

b. "You'll work closely with our editorial team, lead illustrator, and publishing specialists to create a book that aligns perfectly with your vision. From refining your story to creating compelling illustrations, you'll have direct access to experienced professionals who will help you make informed decisions at each stage."

c. "As one of our founding cohort authors, you'll receive exclusive, hands-on attention and personalized feedback. This ensures your book is of the highest quality, captures the essence of your story, and truly stands out."

d. "Our approach is collaborative—you're not just an author; you're an active partner in the process. You'll be involved in key decisions, from character development to the final

31

illustrations, to ensure that the book truly represents your vision."

134. Ms. Zanoni has suffered and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law, including but not limited to loss of control over her work, interference with her exclusive rights to publish and exploit the work, and harm to its reputation and marketability. Absent injunctive relief, such harm will continue and cannot be fully remedied by monetary damages.

## COUNT IX – DECLARATORY JUDGMENT, 28 U.S.C. § 2201

### (AGAINST HOPE BOOKS)

135. Ms. Zanoni incorporates by reference all preceding paragraphs as if fully set forth herein.

136. An actual, present, and justiciable controversy exists between Ms. Zanoni and Hope Books concerning the validity and enforceability of the Publication Rights Agreement.

137. Hope Books contends, and has at all relevant times contended, that the Publication Rights Agreement is valid and enforceable according to its terms, including but not limited to provisions purporting to grant Hope Books an exclusive, perpetual, and irrevocable license in Ms. Zanoni's work, to prohibit refunds under any circumstances, and to release Hope Books from liability.

138. Ms. Zanoni contends that the Publication Rights Agreement is void or, in the alternative, voidable and unenforceable, in whole or in part, for multiple independent reasons.

139. First, the Publication Rights Agreement was procured through fraudulent and/or negligent misrepresentations and omissions by Hope Books, including but not limited to representations that:

    a.    Ms. Zanoni would have direct access to and work collaboratively with

Case 3:26-cv-00332   Document 1   Filed 04/27/26   Page 32 of 36

illustrators and publishing professionals;

b.      Ms. Zanoni would be an active partner in the creative process, including illustration development;

c.      Ms. Zanoni's book would be developed and published within an approximate six-month timeframe; and

d.      The publishing process would involve professional, human-created illustrations consistent with industry standards.

140.    These representations were material, were relied upon by Ms. Zanoni, and were false or misleading when made, or were made without a reasonable basis. Hope Books failed to disclose that illustrations would be generated or materially assisted by artificial intelligence tools and that Ms. Zanoni would not have meaningful access to or collaboration with illustrators.

141.    As a direct result of such misrepresentations and omissions, Ms. Zanoni was induced to enter into the Publication Rights Agreement.

142.    Second, the Publication Rights Agreement is unconscionable and therefore unenforceable. The agreement is procedurally unconscionable in that it was presented to Ms. Zanoni, a first-time author, on a take-it-or-leave-it basis after Ms. Zanoni had already invested substantial time and money, and without meaningful opportunity to negotiate its terms.

143.    The Publication Rights Agreement is substantively unconscionable in that it contains, among other things:

a.      A purported exclusive, perpetual, and irrevocable license in Ms. Zanoni's work;

b.      A provision prohibiting refunds under any circumstances;

c.      A broad release of claims in favor of Hope Books; and

d.     Provisions granting Hope Books sole and absolute discretion over whether and when to publish the work;

which, taken together, unreasonably favor Hope Books and deprive Ms. Zanoni of the benefit of the bargain.

144.    Third, the Publication Rights Agreement is illusory and lacks mutuality of obligation, in that it grants Hope Books broad discretion over performance while imposing significant obligations and restrictions on Ms. Zanoni, resulting in a lack of enforceable promises by Hope Books.

145.    Fourth, the provisions of the Publication Rights Agreement purporting to release Hope Books from liability and to prohibit refunds are unenforceable as contrary to public policy, particularly where, as here, they are invoked to shield Hope Books from its own deceptive or unfair conduct.

146.    Ms. Zanoni faces ongoing harm because Hope Books claims rights in Ms. Zanoni's work.

147.    In light of the foregoing, a real and substantial controversy exists as to the parties' respective rights and obligations under the Publication Rights Agreement.

148.    Ms. Zanoni seeks a judicial declaration, pursuant to applicable law, that:

a.     The Publication Rights Agreement is void and of no legal force or effect; or

b.     Alternatively, the Publication Rights Agreement is voidable at Ms. Zanoni's election; or

c.     Alternatively, specific provisions of the Publication Rights Agreement, including but not limited to the perpetual license, no-refund provision, and release of claims, are unenforceable; and

34

d.       Ms. Zanoni retains all rights, title, and interest in and to her work, free and clear of any claim by Hope Books.

149.   A declaratory judgment is necessary and appropriate at this time in order to resolve the parties' dispute, clarify their legal rights, and prevent further harm to Ms. Zanoni.

***

**WHEREFORE,** Ms. Zanoni respectfully requests a trial by jury on all claims so triable and respectfully requests that the Court enter judgment in her favor and grant the following relief:

(a)       Award Ms. Zanoni compensatory damages in an amount to be determined at trial;

(b)       Award Ms. Zanoni restitution of all amounts paid to Defendants, including but not limited to the $7,997 publishing program fee;

(c)       Treble Ms. Zanoni's damages pursuant to the North Carolina Unfair and Deceptive Trade Practices Act;

(d)       Award Ms. Zanoni reasonable attorneys' fees and costs as permitted by law pursuant to the North Carolina Unfair and Deceptive Trade Practices Act;

(e)       Declare that the Publication Rights Agreement void, voidable, or otherwise unenforceable, in whole or in part;

(f)       Declare that Ms. Zanoni retains all right, title, and interest in and to her work, free and clear of any claim by Defendants;

(g)       Order rescission of the Publication Rights Agreement and restoration of the parties to their pre-contract positions;

(h)       Award pre-judgment and post-judgment interest as allowed by law;

(i)       Grant such equitable relief as the Court deems just and proper, including but not limited to permanent injunctive relief prohibiting Defendants from using, exploiting, or claiming

35

any rights in Ms. Zanoni's work; and

(j)      Grant such other and further relief as the Court deems just and proper.

Dated: April 27, 2026

**VOGEL PLLC**

*/s/ Jonathan A. Vogel*
Jonathan A. Vogel
N.C. Bar No. 34266

6000 Fairview Road, Suite 1200
Charlotte, NC 28210
Tel.: 704.552.3750
jonathan.vogel@vogelpllc.com

*Attorney for Plaintiff*

36